**77 So.2d 32**

**RICHARDSON & BASS (Louisiana Account)**

v.

**BOARD OF LEVEE COMMISSIONERS OF the ORLEANS LEVEE DISTRICT et al.**

**No. 41671.**

Nov. 8, 1954.

Rehearing Denied Dec. 13, 1954.

James David McNeill, New Orleans, for defendant-appellant.

Provosty, Sadler & Scott, Ledoux R. Provosty, Alexandria, Doyle, Smith & Doyle, and Charles C. Gremillion, New Orleans, for defendants-appellees.

McCALEB, Justice.

This matter presents for determination the ownership of a parcel of land situated in River Lot Sections 4 and 5, T. 18 S., R. 16 E., Plaquemines Parish, having a frontage of 1¼ arpents on the east bank of the Mississippi River by 40 arpents in depth. The issue arises in a concursus proceeding which was initiated by Richardson & Bass, a copartnership holding mineral leases from the rival claimants to the disputed area. Specifically, Richardson & Bass, mineral lessee of the Board of Commissioners of Orleans Levee District to a large area of land situated in the Bohemia Spillway in Plaquemines Parish, unitized property thereunder in the Cox Bay Area. One of these units is designated as Unit No. 3. comprising 137.4840 acres in River Lot Sections 4 and 5, T. 18 S., R. 16 E. and the lease of the Levee Board to Richardson & Bass embraces this entire area. In addition, Richardson & Bass holds various leases (26 in number) from the heirs and assigns of one Leonard Edgecombe, hereinafter referred to as "the Edgecombes", covering 38.86 acres in parts of Sections 4 and 5 of the same unit. Upon discovery and production of oil and gas from this unitized area, Richardson & Bass, being unable to determine the legal ownership to the 38.86 acres in the unit in view of the appar-

ent conflict of interest between the Levee Board and the Edgecombes, invoked this proceeding and, depositing the royalties attributable to the acreage in the registry of the court, cited them to appear and assert their rights.

The Edgecombes claim the disputed property through their ancestor, Leonard Edgecombe, who acquired certain lands in River Lot Sections 4 and 5, T. 18 S., R. 16 E., Plaquemines Parish. The Levee Board also claims from this source, pleading that it has acquired title to the land by virtue of the prescription of ten years under a deed dated August 17, 1925, wherein Mrs. Julia C. Brown, widow of Leonard Edgecombe, transferred to it certain lands owned by her, allegedly including therein the property in dispute.

After a hearing on this issue, and others presented by the parties in their pleadings, the trial judge overruled the plea of the Levee Board and held that the Edgecombes were the owners of the contested acreage. The Levee Board has appealed from the adverse decision.

The record establishes the following facts. According to the official township plat, under which River Lot Sections 4 and 5; T. 18 S., R. 16 E., Plaquemines Parish were patented by the United States, these sections front on the east bank of the Mississippi River and extend back to the 40-arpent line, each section having a frontage of 4 arpents. Leonard Edgecombe, during his lifetime, first acquired the lower $\frac{9}{12}$ths part (1 ar-

pent) front by 40 arpents depth of River Lot Section 4 and thereafter purchased at tax sale all of River Lot Section 5, which was described as measuring 4 arpents front by 40 arpents in depth. Consequently, his total original holdings amounted to 5 arpents fronting on the Mississippi River, consisting of all of Section 5 and the lower 1 arpent of Section 4.

On June 18, 1872, Leonard Edgecombe sold to Diedrick Wichusen the lower $\frac{1}{2}$ of Section 5, measuring 2 arpents front by 40 arpents in depth, thus retaining for himself the 2 upper arpents in Section 5 and the lower 1 arpent in Section 4, which he owned at the time of his death on August 18, 1883. He was survived by his widow, Julia C. Brown, and the eight children of the marriage who were his sole and only heirs.

On July 9, 1891, Mrs. Edgecombe, as tutrix of her six minor children and pursuant to a recommendation of a family meeting, transferred the lower $\frac{1}{2}$ arpent of the property owned by the estate in Section 5 to Aaron Davis in payment of legal services rendered. Therefore, after this sale, the widow and heirs owned in indivision $2\frac{1}{2}$ arpents of land fronting on the river, being the lower 1 arpent front of Section 4 and the upper $1\frac{1}{2}$ arpents front of Section 5.

On August 14, 1891, a judicial partition in kind was made of this property between Mrs. Edgecombe and her children, with the advice and approval of a family meeting. In this partition, Mrs. Edgecombe ac-

quired two separate parcels of the 2½ arpents fronting on the river. She obtained title to the lower half of the 1½ front arpents situated in Section 5, which remained after the transfer of the lower ½ arpent in that Section to Aaron Davis—that is, she acquired ¾ of 1 arpent which was adjacent to the property of Aaron Davis.

In addition to this, she was given the upper ½ of the lower front arpent situated in Section 4, thus acquiring a total of 1¼ of the 2½ arpents left in the succession after the sale to Aaron Davis, i. e., ¾ of 1 arpent in Section 5, above the property of Davis, and the upper ½ of 1 arpent of the lower front arpent situated in Section 4.

The Edgecombe children received in the partition a like quantity of land as that given their mother, i. e., 1¼ arpents front by 40 arpents in depth, but their acreage was contiguous, being the upper half of the 1½ arpents front owned by the succession in Section 5 (¾ of 1 arpent) and the lower half of the lower front arpent owned by the succession in Section 4. This property has never been conveyed by the children or their assigns to the Levee Board.

By Act No. 99 of 1924, the Board of Commissioners of the Orleans Levee District was authorized to construct a spillway on the east bank of the Mississippi River in the Parish of Plaquemines in accordance with plans and specifications approved by the State Board of Engineers and the Mississippi River Commission. In order to carry out the work, the board was empowered "to acquire by purchase, donation or expropriation" the necessary lands or other property. However, this power was limited and the Levee Board was required, by Section 3 of the Act, "as a condition precedent to removing any levees or taking possession of any property, to acquire by purchase or expropriation and to pay for all lands and property privately owned within the area covered by the proposed plan from the upper to the lower limits thereof and from the Mississippi River to the sea".

Conformable with this authority, the Levee Board made plans for the acquisition of the various lands to be used for spillway purposes. It appointed a real estate committee to appraise the properties and to do all things necessary toward their acquisition. Mr. F. J. Lobrano, Clerk of Court and Ex Officio Recorder of Plaquemines Parish, was employed to make abstracts of the various titles to the land and, when this was done, the abstracts were forwarded to the then general counsel of the Levee Board for examination of the titles.[1]

On August 17, 1925, Mrs. Edgecombe sold to the Levee Board the 1¼ front arpents owned by her in Sections 4 and 5 for the sum of $1,500. In this tranfer, the

---

1. The record contains a letter, dated August 17, 1926, written by the general counsel of the Levee Board to its President, in which he gives a detailed account of the work done by his department in the examination of titles for this project.

property is described in the identical language as that contained in the act of partition under which Mrs. Edgecombe obtained title to these 1¼ front arpents, consisting of non-contiguous tracts, ¾ of 1 arpent front being located in Section 5 and ½ of 1 arpent being located in Section 4. The description reads as follows:

"1st. All and singular that certain portion of land situated in Plaquemines Parish on the left bank of the Mississippi River at about sixty (60) miles below the City of New Orleans having and measuring three-quarters (¾) of one arpent front on said river by forty (40) arpents in depth, bounded below by the One-Half (½) arpent transferred to Aaron Davis, assignee, the said three-quarters of the One Arpent being part and portion of the property firstly described.

"2nd. That certain portion of land forming the upper portion of the property secondly described being One-Half (½) of one arpent front by forty arpents in depth, together with all the buildings and improvements thereon, and the rights, ways, privileges thereunto appertaining. *Being the same property acquired by Mrs. Julia C. Edgecombe, No. 176, 24th Judicial District Court June 19, 1891, C.O.B. 29, fo. 381½*". (Emphasis ours.)

In addition to the foregoing, the deed recites that:

"The property herein conveyed constitutes tract No. 91 on 5 certain plats, or maps, marked Sheet No. 1, Sheet No. 2, Sheet No. 3, Sheet No. 4 and Sheet No. 5, showing the property on the East bank of the Mississippi River between the lower limits of the Bohemia Plantation and the upper end of the United States Military Reservation at Fort St. Philip and which said 5 maps are attached to an act before Edward C. Brodtmann, Notary Public, of July 3rd 1925.

\* \* \* \* \* \*

"The property herein conveyed by the vendor comprises all that she possesses in the Parish of Plaquemines and, is described on the tax rolls of said parish as One and one-fourth arpents front by various depths bounded above by lands belonging to W. H. Edgecombe and below by Church Property."

Since it is clearly established that the Edgecombes acquired a tract, consisting of 1¼ front arpents in Sections 4 and 5, in the partition of Leonard Edgecombe's succession and have never voluntarily parted with title thereto, it follows that their legal ownership of that property remains unimpaired, unless it has been divested by virtue of the ten-year prescription acquirendi causa pleaded by the Levee Board.

In the lower court, the Levee Board initially met the claim of the Edgecombes by way of an exception of no right or cause of action which has been reasserted and

argued here. That exception is predicated on the premise that, since the property in controversy was not assessed to the Edgecombes for taxes for the year preceding its appropriation by the Board for spillway purposes, they are without a right or cause of action to present their claim of ownership. In support of this postulation, counsel for the Board cites a line of cases in which it has been held that, in a suit for compensation for loss of property used or destroyed for levee purposes, it is essential that the landowner allege that the property was assessed for taxes in the preceding year. Lacour v. Red River, Atchafalaya & Bayou Boeuf Levee Dist., 158 La. 737, 104 So. 636; Weeks v. Nineteenth Louisiana Levee Dist., La.App., 165 So. 491; Scott v. Red River-Bayou Pierre Levee & Drainage Dist. of Louisiana, La.App., 7 So.2d 429 and Dickson v. Board of Com'rs of Caddo Levee Dist., 210 La. 121, 26 So.2d 474.

 The obvious answer to this contention is that the Edgecombes are not seeking to recover the amount provided by Section 6 of Article 16 of the Constitution for lands and improvements used or destroyed for levee or levee drainage purposes; they desire recognition of their title to the contested property, which has not been affected by the use of the land by the Levee Board for spillway purposes. Counsel for the Levee Board does not contend otherwise as it has been many times recognized by this court that the constitutional provision for payment of the assessed value to the owner for property used for levee purposes is merely a gratuity given to the owner whose land is burdened with the servitude imposed thereon by Article 665 of the LSA–Civil Code. See Boyce Cottonseed Oil Mfg. Co. v. Board of Com'rs of Red River, Atachafalaya & Bayou Boeuf Levee Dist., 160 La. 727, 107 So. 506; Mayer v. Board of Com'rs for Caddo Levee Dist., 177 La. 1119, 150 So. 295 and Dickson v. Board of Com'rs, supra. Hence, appropriation of such land by a Levee Board for levee purposes neither conveys a title to the Board nor does the payment of the assessed value to the owner operate as a transfer of title.[2] See Dickson v. Board of Com'rs, supra, and cases there cited.

The Levee Board apparently concedes, as it must, that the Edgecombes were the owners of the legal title to the property in dispute. However, its counsel maintains that the Board has acquired the property by the prescription of ten years provided by Article 3478 of the LSA–Civil Code.

Article 3479 of the LSA–Civil Code declares that, in order to acquire the owner-

---

2. If it did, Section 6 of Article 16 might be declared inimical to Section 2 of Article 1 of our Constitution, providing that private property shall not be taken except for public purposes and after just and adequate compensation is paid, and also violative of the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution. See Eldridge v. Trezevant, 160 U.S. 452, 16 S.Ct. 345, 40 L.Ed. 490.

ship of immovables by the ten-year prescription, four conditions must concur, (1) good faith on the part of the possessor, (2) a title translative of the property, (3) possession during the time required by law and (4) an object which may be acquired by prescription.

Counsel for the Edgecombes assert that the plea of prescription is not well founded as two of the foregoing requirements are lacking—that there is no title in favor of the Levee Board translative of the property in question and that the Board is in legal bad faith.

These points are well taken. In the first place, there is nothing in the descriptions contained in the deed from Mrs. Edgecombe to the Levee Board which would be translative of the property in suit. The first description of the property conveyed by that deed, which we have quoted above, shows that Mrs. Edgecombe sold the identical lands she received in the partition of her husband's succession. This property, as we have above stated, consisted of two non-contiguous tracts, one ¾ of 1 arpent front on the River, bounded below by the ½ arpent transferred to Aaron Davis. The other was the ½ of an arpent fronting on the River, being the upper ½ of the succession property situated in Section 4. The total frontage conveyed, as shown by the deed, was 1¼ arpents which is exactly the amount owned by Mrs. Edgecombe and, therefore, plainly did not include her children's property as the combined ownership of Mrs. Edgecombe and the children amounted to 2½ arpents front by 40 arpents in depth.

Counsel for the Levee Board, however, points to the other description contained in the act, which states that the property conveyed "constitutes tract No. 91 on five certain plats or maps", attached to another Act before Brodtmann, Notary Public, and argues that the land of the Edgecombe children was bound to be included in Tract No. 91 of the Brodtmann plat as that tract, and those above and below it, covered all of the land fronting on the River within the Bohemia Spillway.

The answers to this proposition are many. Primarily, it is apt to observe that the accuracy of the Brodtmann plats or maps has not been established. They are not supported by surveys and do not show the River Lot Sections or governmental subdivisions; they purport to exhibit only the ownership and appraisal value of numerous tracts fronting on the Mississippi River in Plaquemines Parish which the Levee Board was seeking to acquire under the authority given it by Act 99 of 1924. But, even so, it would appear from an examination of Tract No. 91 on the plat that it does not and cannot be regarded as describing the property in dispute—for this tract is shown to have a frontage of 1¼ arpents belonging to Julia Edgecombe, which is the amount of frontage owned by her, and does not include the 1¼ arpents frontage owned by her children. Obviously, in order for

tract No. 91, shown on the Brodtmann plat, to have contained the property in contest, it would have had to show a frontage of 2½ arpents.

▇▇▇ Nor will it do for the Levee Board to say that it has obtained the property in dispute because it acquired all of the land in that vicinity for spillway purposes. It is well settled that, in order that the deed may be regarded as translative of property, there must be some sort of a description of the land so that it may be identified. Hanson Lumber Co. v. Angelloz, 118 La. 861, 43 So. 529; Castera's Heirs v. New Orleans Land Co., 125 La. 877, 51 So. 1021; Bendernagel v. Foret, 145 La. 115, 81 So. 869; McHugh v. Albert Hanson Lumber Co., 145 La. 421, 82 So. 392; Harang v. Gheens Realty Co., 155 La. 68, 98 So. 760; Bayard v. Baldwin Lumber Co., 157 La. 994, 103 So. 290; Matthews v. Olla State Bank, 164 La. 463, 114 So. 98; Weaks v. Evans, 178 La. 1074, 152 So. 908; Continental Land & Fur Co. v. Lacoste, 192 La. 561, 188 So. 700; Pierce v. Hunter, 202 La. 900, 13 So.2d 259 and Buckley v. Catlett, 203 La. 54, 13 So.2d 384.

A similar contention to that of the Levee Board, respecting its alleged in globo acquisition of the contested land, was advanced under a plea of prescription in Waterman v. Tidewater Associated Oil Co., 213 La. 588, 35 So.2d 225, 236. There, after stating that the deed must identify the land with clarity and it is not enough that the description might be construed to include the land, we observed:

"Here, the conveyance refers to all of the land in two townships without reference to sections or subdivisions. This type of description is wholly inadequate (even if the acquisition clauses are not considered) to form the basis of a title translative of property".

▇▇▇ But, apart from the failure of the Levee Board to exhibit a title translative of the contested land, its plea of prescription must fail because the record clearly shows that it was in legal bad faith as it caused abstracts to be made of the titles of all the lands it was acquiring under Act No. 99 of 1924 and the titles were examined and approved by its general counsel.

In Arnold v. Sun Oil Co., 218 La. 50, 48 So.2d 369, 376, we quoted with approval from Dinwiddie v. Cox, La.App., 9 So.2d 68, on the question of the legal good faith necessary for a purchaser to avail himself of the ten years prescription acquirendi causa, as follows:

"It is true, as contended, no one is required to examine the public records to determine the validity of title to real property he contemplates purchasing as a condition precedent to good faith. He may purchase without any investigation of the title and if the four named essentials exist, he is protected by the prescription of ten years. But if he is not satisfied with the title offer-

ed by the seller and institutes an investigation into its validity, from which facts and conditions are revealed which should put a reasonably prudent person on inquiry, it then devolves upon him to pursue every lead and ferret out all the facts to the end that he may not purchase until he has complete information before him. If he does not do this, but purchases upon erroneous assumptions and conclusions, he does so at his own risk and peril."

In the case at bar, it would have taken only a casual inspection of the partition proceedings of the succession of Leonard Edgecombe to reveal that his children were given title to half of the frontage of 2½ arpents owned by the succession and that Mrs. Edgecombe received the other half. Hence, the failure of the title examiner to investigate these proceedings, shown on the abstract and in the deed to be Mrs. Edgecombe's source of title, precludes the Board (among other reasons) from successfully claiming a title by prescription.

Since the submission of this case for decision one of the appellees, Aaron A. Edgecombe, departed this life and, by order entered on November 3, 1954, his legal heirs have been admitted as parties to the suit and authorized to stand in judgment herein in his place and stead. As a consequence, an amendment to the judgment is in order.

The judgment appealed from is therefore amended so as to run in favor of Mrs. Marion Edgecombe Schroeder, Mrs. Dixie Edgecombe Humes, Mrs. Martha Edgecombe Richard, Mrs. Aldean Edgecombe Francis, Mrs. June Edgecombe Zwicke, Aaron A. Edgecombe, Jr., Lyle L. Edgecombe, Roy F. Edgecombe and Robert E. Edgecombe, the sole heirs of Aaron A. Edgecombe, as substituted parties herein in the place and stead of their deceased father. As thus amended, the judgment is affirmed.

FOURNET, C. J., concurs in the decree and will assign reasons.

HAWTHORNE and MOISE, JJ., concur in the decree.

PONDER, J., dissents and hands down reasons.

FOURNET, Chief Justice (concurring).

In my opinion the description in the deed, particularly when it recites that "The property herein conveyed constitutes tract No. 91 on 5 certain plats, or maps * * *" —which unquestionably include the property in controversy here—makes the deed translative of title. However, inasmuch as I agree with the majority view that according to the facts in this case the Levee Board is in legal bad faith, I concur in the holding that the plea of ten years' prescription acquirendi causa must fail.

PONDER, Justice (dissenting).

I cannot agree with the holding in the majority opinion because I am of the opin-

ion that the deed conveyed the property in dispute and that the Levee Board was in good faith when it purchased it.

The record shows that the lands belonging to Julia F. Edgecombe and the heirs was bounded above by the lands then owned by Edgar Williams, designated as Lot No. 90 in the Brodtmann plats or maps. The lands were bounded below by lands then owned by Haspel & Davis Co., Ltd., designated on these maps and plats as being Lot No. 92. The lands lying between these two lots is the lands owned by Julia Edgecombe and the heirs and is designated as Lot No. 91. The description in the deed states that the lands were bounded on the south by the lands of Aaron Davis, who thereafter sold his lands to Haspel & Davis Co., Ltd. The description in the deed recites that the lands are bounded above by the lands of W. H. Edgecombe, who later sold his land to Edgar Williams, and below by church property, which was later owned by Haspel & Davis Co., Ltd. In other words, the lands of Julia Edgecombe and the heirs, designated as Lot No. 91, was bounded above by Lot No. 90 then owned by Edgar Williams and bounded below by Lot No. 92 then owned by Haspel & Davis Co., Ltd. The Levee Board acquired these two lots, No. 90 and No. 92, from the then owners and the property in dispute could therefore only be contained in Lot No. 91. When Lot No. 91 was conveyed to the Levee Board, it contained all the property in dispute. The majority opinion

questions the accuracy of the Brodtmann maps or plats and states they are not supported by surveys. I find in the record maps and plats of a survey made by Frank T. Payne, a civil engineer, wherein all of the lands in the area of the spillway were surveyed and platted. The Brodtmann maps and plats, on comparison, show that they were copies following the delineations of the maps of the Payne survey. The Payne survey was accepted and recognized by this Court in the year 1927 in the case of Board of Levee Com'rs of Orleans Levee Dist. v. Orangedale Colony Co., 164 La. 77, 113 So. 772 in an expropriation suit brought by the Levee Board involving lands in the spillway area. It was stated in that case that there had been no survey made previous to the Payne survey and that the acreage stated in the patent was nothing more than an estimate and the court held that the Levee Board must pay for the acreage shown by the survey. The Payne survey shows that Lot No. 91 was owned by Julia Edgecombe and was bounded above by Lot No. 90 owned by Edgar Williams and below by Lot No. 92 owned by Haspel & Davis Co., Ltd. The Brodtmann map is to the same effect.

It does not appear that any survey of this property was made prior to the Payne survey. It appears that all of the property acquired in the spillway was acquired in accordance with the survey or maps and plats taken from the survey which were referred to in the deeds and was referred to and recognized in the deed under

consideration. The survey was made with the view of locating the property owned by the various property owners in that area and the property owners sold and the Levee Board acquired the property in accordance with the survey.

The majority opinion does not refer to the fact that Leonard F. Edgecombe and Aaron A. Edgecombe, two of the heirs, signed the deed as witnesses and insofar as they are concerned it would appear that they acquiesced in the transfer of the land.

The majority opinion refers to what is termed an abstract made by the Clerk of Court. The record shows that it was no abstract of title but merely certificates showing the description of the property in the deed to Julia Edgecombe, that it had not been alienated, that it was free from mortgage, to whom it was assessed and who had paid the taxes. The opinion of the general counsel based on this information could not be considered a title opinion. It appears from the opinion of the general counsel that the so-called abstracts, made of all the property in the spillway, is contained in Vols. 41 to 43, inclusive, of the records of the Levee Board. There is nothing in this record to show that any examination of the title is revealed therein. The burden of proof is upon the heirs to show that the Levee Board was in bad faith and they have failed to sustain this burden. I believe that the plea of ten years acquisitive prescription should be maintained and, therefore, respectfully dissent.